RAFAEL BUSCAGLIA, EN SU CARÁCTER DE TESORERO DE PUERTO RICO, peticionario, *v.* TRIBUNAL DE CONTRIBUCIONES, demandado; MARÍA MONSERRATE SANTIAGO Y RIVERA y OTROS, interventores.

Núm. 197.—*Sometido:* Enero 10, 1949. *Resuelto:* Abril 11, 1949.

*Hon. Procurador General Vicente Géigel Polanco (Luis Negrón Fernández, Ex Procurador General,* en la petición de certiorari y *José C. Aponte, Procurador General Interino,* en el alegato) y

*Carlos Santana Becerra* y *J. B. Fernández Badillo, Procuradores Generales Auxiliares,* abogados del peticionario; *Enrique Córdova Díaz* y *Raúl Matos,* abogados de los interventores, querellantes en el pleito principal.

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

Al fallecer Vicente Usera Laseda, sus herederos pagaron contribución de herencia montante a $31,736.18. El Tesorero determinó que debió pagarse la suma de $67,444.29. Los herederos radicaron ante el Tribunal de Contribuciones una querella en la que solicitaban que se declarase que ellos habían pagado la contribución correcta. Celebrado un juicio en los méritos, la mayoría del Tribunal de Contribuciones declaró con lugar la petición. Expedimos el auto de *certiorari* a solicitud del Tesorero para revisar esta decisión.

Vicente Usera Laseda tenía 82 años y 8 meses de edad a la fecha de su fallecimiento el 29 de diciembre de 1943. El 9 de abril de 1942 otorgó una escritura donándole a sus hijos las fincas "La Esmeralda" y "Las Gavias", valoradas en $309,606 y $164,819 respectivamente. La cuestión primordial en este caso es si el Tesorero tiene razón al sostener que estas fincas debieron haberse incluído entre los bienes heredados por los herederos de Usera Laseda al morir éste veinte meses después del otorgamiento de la escritura de donación.

La teoría del Tesorero es que la escritura fué una donación pro forma simulada, que no trajo como resultado la transferencia del título durante la vida del finado. Si bien expresamente rechaza cualquier intención de atacar la escritura a causa de incapacidad mental de Usera cuando la otorgó, no obstante el Tesorero sostiene que "esta donación no fué el acto exclusivo y libre del causante sino más bien el resultado de un plan ideado por sus herederos y administradores en el cual el causante meramente fué un elemento pasivo".

El Tesorero presentó considerable evidencia en apoyo de

su teoría de que la donación fué simulada. La escritura nunca se inscribió. Dividió las fincas entre los hijos del finado exactamente en la misma proporción que les hubiera correspondido por herencia. Tanto antes como después del otorgamiento de la escritura de donación, algunos hijos de Usera administraban las fincas de su padre como apoderados de éste. Por documento privado del 10 de abril de 1942 firmado por los donatarios de las fincas, se arrendaron las participaciones de los donatarios que no participaban en su administración, a los que las administraban, conviniéndose en que (1) las fincas se dejarían indivisas y se administrarían en igual forma que antes de efectuarse la donación y (2) los arrendadores recibirían $1.50 por tonelada de azúcar como canon de arrendamiento.

La escritura y el arrendamiento privado, aun cuando se otorgaron en abril de 1942, disponían que tendrían efecto retroactivo al 31 de diciembre de 1941. Esto efectuó una reducción en la contribución sobre ingresos pertenecientes al año natural de 1942, ya que siete personas en vez de una sola, reportaron los beneficios provenientes de estas fincas, como sus ingresos para el 1942.

Aun después del otorgamiento de la escritura de donación, se enviaron cartas con respecto a estas dos fincas a la Comisión de Servicio Público, a la AAA, al Fondo del Seguro del Estado, a una agencia gubernativa que tramitaba las prioridades para abonos, y a la Central Caribe, firmadas a nombre del finado, por sus hijos como apoderados de éste, y se referían a estas fincas como propiedad del padre.

Las solicitudes de compensación a la AAA manifestaban que el productor era Vicente Usera, y que el 100 por ciento de dicha compensación le pertenecía. Se continuó expidiendo los cheques a su nombre y se depositaban en su cuenta corriente. En igual forma, la Central Caribe, que molía las cañas producidas en estas fincas, expedía los cheques correspondientes a nombre del finado. Las contribuciones sobre la

propiedad se continuaron pagando a nombre de Usera, padre, y se cargaban a su cuenta bancaria.

El Tesorero presentó una carta fechada el 14 de julio de 1942, firmada a nombre del finado por uno de sus hijos, dirigida a la AAA. Dicha carta trataba de estas fincas y decía en parte que "Por separado envío planos que cubren mis siembras de cañas, con detalle de la extensión de cada una de las piezas que las componen. Estos planos han sido preparados para la distribución de estas tierras entre mis herederos *en su oportunidad* y de aquí que aparezcan sus nombres en cada hoja." (Bastardillas nuestras).

Vicente Usera otorgó su testamento el 29 de septiembre de 1942. Manifestaba que no describía sus propiedades en su testamento porque sus bienes inmuebles aparecían inscritos en el Registro. Para dicha fecha la escritura de donación no se había presentado al Registro. Sin embargo, en su testamento no mencionó la donación. Y al otorgarlo, lo mismo que al otorgar la escritura de donación, trató a todos sus hijos exactamente en idéntica forma.

En apoyo de su teoría de que ésta fué una donación simulada planeada por los hijos, el Tesorero introdujo también evidencia al efecto de que el finado tenía 82 años de edad cuando otorgó la escritura; que para aquel entonces padecía de diabetes y de arteriosclerosis; que el 13 de marzo de 1942, pocos días antes del otorgamiento de la escritura de donación, uno de los herederos juró la planilla de contribución sobre ingresos del finado, manifestando que éste estaba enfermo; que la planilla de 1943 fué jurada en igual forma; que el mismo día en que se otorgó la escritura, el finado sufrió dos exacerbaciones que corrientemente dejan a la persona en estado semicomatoso.

Por otro lado, los contribuyentes presentaron prueba de que Usera había estado discutiendo durante un año con su abogado y con su banquero la posibilidad de hacer esta donación; que a pesar de su edad y dolencia, se sentía bien y

estaba mentalmente alerta y nunca pensó en la muerte; que la donación fué idea suya y conllevaba dos propósitos, es decir, (1) convertir a sus hijos ya maduros en personas económicamente independientes, y (2) evitar altas contribuciones sobre ingresos.

También ofrecieron los herederos prueba al efecto de que la escritura no se inscribió debido al alto arancel, que luego fué reducido; que la AAA, el Fondo del Seguro del Estado, etc., no fueron notificados del cambio en el título con motivo del expedienteo envuelto al efectuarse un traspaso en dichos organismos; que la Central Caribe fué notificada de que los hijos eran ahora dueños de las fincas; que el finado escribió a la Autoridad de Tierras que ya no era el dueño de las fincas; que los cheques de la Central y de la AAA se depositaron en la cuenta del padre con el fin de reembolsarle por los préstamos refaccionarios que él le hacía a sus hijos; que los libros del padre reflejaban fielmente todas estas transacciones; que los hijos pagaban contribuciones de ingresos sobre el ingreso neto proveniente de sus participaciones en estas fincas después de otorgarse la escritura de donación; y que el padre era dueño de bienes valorados en $600,000 luego de donarle estas fincas a sus hijos.

Repetidamente hemos resuelto que carecemos de autoridad para examinar de nuevo la evidencia, con el fin de determinar si convenimos con aquéllos que determinan los hechos. La Asamblea Legislativa ha limitado nuestra revisión a errores de derecho. Y sólo cuando no existen hechos en qué basar las conclusiones del Tribunal de Contribuciones es que podemos decir que se cometió un error de derecho. *Fajardo v. Tribunal de Contribuciones,* 68 D.P.R. 746, 749, y casos citados; *Buscaglia v. Tribunal de Contribuciones; Pérez Vahamonde, Interventora,* 68 D.P.R. 345, 351. Había evidencia para sostener las conclusiones del Tribunal de Contribuciones al efecto de que (1) hubo una donación real y efectiva, no simulada, y (2) que el padre voluntariamente la

planeó y la llevó a cabo dándose completa cuenta de las consecuencias de sus actos. Por tanto, no tenemos autoridad para alterar estas conclusiones.

■ De conformidad con la sección 13 de la Ley núm. 99, Leyes de Puerto Rico, 1925(¹) aun una efectiva donación *inter vivos* está sujeta a la contribución de herencia, si se hace con el fin de evadir tal contribución. Un estatuto federal análogo provee que los traspasos hechos "en contemplación de muerte" estarán sujetos a la contribución federal de herencia. Bajo el estatuto federal todavía no se ha aclarado, cuando existen más de un motivo para hacer una donación, si la "contemplación de muerte" debe ser el motivo predominante, o si es suficiente, para que el traspaso esté sujeto al pago de la contribución, que la "contemplación de muerte" sea un motivo sustancial, aun cuándo no el predominante. Véanse *Allen* v. *Trust Co.*, 326 U.S. 630; *City Bank Co.* v. *McGowan*, 323 U.S. 594; *Estate of Edwin W. Rickenberg*, 11 T.C. 1; *Farmers' Loan & Trust Co.* v. *Bowers*, 98 F2d 794, *certiorari* denegado, 306 U.S. 648; *Tait* v. *Safe Deposit & Trust Co. of Baltimore*, 74 F.2d 851, 854 (C.C.A. 4, 1935); *Sellinger's Adm'r* v. *Reeves*, 166 S.W.2d 54, 57 (Ky., 1942); *Bank of New York* v. *Kelly*, 38 A.2d 899, 902 (N.J., 1944); *Annotations*, 120 A.L.R. 170, 148 A.L.R. 1051; 1 Paul, *Federal Estate and Gift Taxation*, sec. 6.01 *et seq.*, y 1946 *Supp.*, pág. 91 *et seq.*; *Practical Aspects of Federal Taxation*, Parte 27, *Estate Taxation: "Contemplation of Death"* por Carlton Fox; Pavenstedt, *Taxation of Transfers in Contemplation of Death: A proposal for Abolition*, 54 Yale L.J. 70; 44 Mich.L.Rev. 876.

(¹)Esta sección lee como sigue: "Toda donación efectuada con el propósito del donante distribuir en vida o después de su fallecimiento el dominio pleno, la nuda propiedad o el usufructo entre sus herederos, con el fin de impedir que quede herencia partible y eludir de este modo el pago de la contribución sobre herencia, será considerada como mortis causa a los efectos de esta ley y quedará sujeta al pago del impuesto provisto por la misma."

Esta sección fué derogada por la número 13, Ley núm. 303, Leyes de Puerto Rico, 1946 ((1) pág. 783). Sin embargo, todavía estaba en vigor cuando ocurrieron los hechos de este caso.

Sin embargo, ni ante el Tribunal de Contribuciones ni ante éste, el Tesorero descansa en la sección 13. Limita su caso a la contención de que la donación fué simulada. En consecuencia dejamos para otra ocasión el punto de si la sección 13, que está fraseada un poco diferente al estatuto federal, provee que una donación estará sujeta al pago de nuestra contribución de herencia, si al hacer la donación, el donante tuvo en mente como motivo sustancial, el evadir tal contribución, aun cuando éste no hubiera sido el único motivo.[2]

Expedimos el auto de certiorari principalmente para examinar la contención del Tesorero de que las fincas "La Esmeralda" y "Las Gavias" debieron incluirse en el caudal hereditario. Por lo tanto creemos innecesario discutir las contenciones del Tesorero en cuanto a la valoración de otras partidas en la herencia.

*La decisión del Tribunal de Contribuciones será confirmada.*

El Juez Asociado Sr. Negrón Fernández no intervino.

---

[2] *Cf. Commissioner of Int. Rev. v. Church*, 335 U.S. 632, 93 L.ed. 310, interpretando el estatuto federal que impone contribuciones a traspasos "hechos con miras a tener efecto cuando la posesión o disfrute de los bienes ocurre a la fecha de la muerte [del trasmitente] o después de ella . . . ".